UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

WAYNE EARL LAFOUNTAIN,

                    Plaintiff,                  Case No. 1:07-cv-76

v.                                    Honorable Paul L. Maloney

ANTHONY MARTIN,

                    Defendant.

_____/

## REPORT AND RECOMMENDATION

        This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. Plaintiff has paid the entire $350.00 filing fee.  On February 27, 2007, this Court ordered service of Plaintiff's complaint on Defendant Anthony Martin.  On April 30, 2007, Defendant  filed a motion for summary judgment (docket #11) on the ground that Plaintiff failed to exhaust his available administrative remedies.  Plaintiff filed a response (docket #15) on or about May 25, 2007, to which Defendant filed an amended reply brief on June 5, 2007 (docket #23).  Thereafter, Plaintiff filed an Appendix of Exhibits (docket #27) on July 3, 2007, and a supplemental brief in opposition to the motion (docket #31) on July 24, 2007.  Upon review, I recommend that Defendants' motion for summary judgment based on Plaintiff's failure to exhaust his available administrative remedies be granted.

## Applicable Standard

        Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of

law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir.), *cert. denied*, 126 S. Ct. 650 (2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.), *cert. denied*, 126 S. Ct. 338 (2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

When the party without the burden of proof (generally the defendant) seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street*

*v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). "A mere scintilla of evidence is insufficient; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see also Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).

> [A] nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part on credibility considerations . . . . [I]nstead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment. [T]he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and . . . the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.

*Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004), *cert. denied*, 543 U.S. 1120 (2005) (citations omitted).

Where, however, a defendant attempts to establish an affirmative defense on summary judgment, it bears the burden of proving "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). *Thomas v. Speedway SuperAmerica, LLC*, __ F.3d __, 2007 WL 3145335, at *3 n.2 (6th Cir. Oct. 30, 2007).

## Facts

Plaintiff is a Caucasian prisoner who is currently incarcerated with the Michigan Department of Corrections and housed at the Riverside Correctional Facility; however, the actions he complains of occurred while he was housed at the Muskegon Correctional Facility (MCF). In his *pro se* complaint, Plaintiff sues Anthony Martin, an African American MCF Resident Unit Corrections Officer.

-3-

Plaintiff is a non-smoker who suffers from Chronic Obstructive Pulmonary Disease (COPD), which encompasses separate diagnoses of emphysema and chronic bronchitis. (Compl. ¶ 4.) Plaintiff alleges that he was transferred to MCF on or about October 10, 2003. (Compl. ¶¶ 4, 9.) At that time, he was assigned to Unit Four, where he was housed with a smoking cell-mate. According to Plaintiff, smoking in Unit Four is routinely ignored. Plaintiff claims that Defendant Martin is himself a cigar smoker who smokes in the unit on a daily basis. (Compl. ¶ 5.) Plaintiff claims that, because of his emphysema, he repeatedly requested transfer to a cell with a non-smoking cell-mate, and he provided names of several non-smoking cell-mates who were willing to room with him. (Compl. ¶ 9.) Eventually, another smoking prisoner was assigned to Plaintiff's cell and Plaintiff was transferred to another cell, where he was given a roommate who was well-known for refusing to get along with white prisoners. Plaintiff asserts that another prisoner was allowed to determine Plaintiff's reassignment and his new cell-mate. (Compl. ¶ 9.) Plaintiff alleges that he filed a grievance on December 31, 2003, Grievance No. MCF 04-01-00002-03C (Def. Ex. 1), naming two first-shift officers and alleging that the transfer violated prison policy and procedure by allowing another prisoner to make the selection of prisoner's new cell-mate. (Compl. ¶ 10.)

On January 5, 2004, after he filed the grievance about his transfer, Plaintiff's laundry bag was mis-delivered to his prior cell address. Plaintiff asked Defendant Martin for permission to retrieve the laundry bag. Martin refused, expressing animosity. Plaintiff requested another grievance form in order to cite Defendant Martin. Martin jumped up from the desk and loudly told Plaintiff to "shut-up," or Martin would "tear the place down" with Plaintiff. (Compl. ¶ 11.) Martin then walked away and stood with a group of black, Muslim prisoners. According to the complaint, Plaintiff heard Martin mention Plaintiff's name in conjunction with the December 31, 2003 grievance. Later that same day, Plaintiff asked Martin for a pass to use the prison library. Martin

told Plaintiff that the librarian had told Martin not to issue a pass for Plaintiff.  (Compl. ¶ 12.)  When a new shift of officers came on duty, Plaintiff received a library permit.  (Compl. ¶ 13.)  Plaintiff filed another grievance on January 5, 2004, Grievance No. MCF 04-01-00007-17A (Def. Ex. 2), in which he complained of Martin's refusal to allow him to retrieve his laundry, Martin's verbal abuse and threats, and Martin's refusal to issue a library pass.  (Compl. ¶ 14.)

Plaintiff contends that, after the January 5, 2004 grievance, he overheard Martin converse loudly with a group of Black Muslim prisoners on numerous occasions.  Martin repeatedly talked about Plaintiff, accusing him of being a "snitch" on all smoking prisoners.  After one such conversation with Plaintiff's black, Muslim cell-mate, the cell-mate entered the cell calling Plaintiff a "snitch," a "rat" and a "sexual predator" who was "stalking" female employees.  (Compl. ¶ 15.)  Between January 7 and 31, 2004, Plaintiff's cell-mate increased his name-calling and began to threaten Plaintiff with bodily harm or death.  Plaintiff approached corrections officers, who, after interviewing both prisoners, directed them to sign a segregation waiver or be placed in segregation.  Plaintiff signed the waiver on January 31, 2004.  (Compl. ¶ 16.)  He was then moved to a different cell with a white, smoking cell-mate.  He told his cell-mate he had emphysema and asked him not to smoke in the cell.  The cell-mate initially agreed.  (Compl. ¶ 17.)

Plaintiff was interviewed on February 5, 2004 about his December 31, 2003 and January 5, 2004 grievances against Martin.  He was told that Martin had denied Plaintiff's allegations.  Plaintiff requested a polygraph examination for both Martin and himself.  When his request was denied, Plaintiff believed he could not prove his claim and, in light of the ongoing retaliation, decided to drop both grievances.  (Compl. ¶ 17; Def. Mot. for Sum. J. Ex. 2, docket #12-4.)

After Plaintiff filed the January grievance, Martin routinely refused to sign passes for Plaintiff, forcing him to look for other officers on the unit to sign. (Compl. ¶ 19.) In addition, beginning in February 2004, Plaintiff experienced renewed harassment from other prisoners, who called him "snitch," "rat," "baby-raper," or "predator." The prisoners, who spoke daily with Martin, followed Plaintiff around the unit, attempting to provoke him into seeking transfer to segregation. In addition, to name-calling, the prisoners threatened Plaintiff with violence and threatened to take his "music," referring to Plaintiff's guitar. (Compl. ¶ 18.) During the first week of March 2004, the threats reached their peak, with as many as six black, Muslim prisoners surrounding Plaintiff and shouting insults and threats. (Compl. ¶ 22.) On March 8, 2004, Plaintiff allegedly filed another grievance directly to Step III, naming Martin and alleging race discrimination and retaliation. Plaintiff alleges that on March 9, 2004, he was confronted by two of the prisoners who had been harassing him. They advised him that they were aware that he was trying to obtain a weapon and they agreed to stop harassing him in exchange for his dropping his Step III grievance. Plaintiff agreed and wrote to Lansing on March 9, 2004, to withdraw the grievance. The March 8 grievance eventually was returned to Plaintiff on March 19, 2004, with instructions to re-file the grievance at Step I. Plaintiff did not re-file the grievance. (Compl. ¶¶ 23-24.)

Plaintiff alleges that, on April 28, 2004, he sent a communication to the Deputy Warden asking to be placed in a cell with a non-smoking cell-mate. (Compl. ¶ 24.) Martin thereafter began calling Plaintiff's cell-mate to the desk, where he told the cell-mate that Plaintiff was a snitch who reported all smoking prisoners and that Plaintiff was a sexual predator and baby-raper. The cell-mate told Plaintiff that Martin was trying to have Plaintiff removed from the room and have a smoking prisoner moved in. Plaintiff's cell-mate subsequently became hostile to Plaintiff and began stealing from Plaintiff. The cell-mate began to smoke in front of Plaintiff and the two

-6-

ultimately engaged in a fist-fight.  Plaintiff again requested a transfer, and, in early June 2004, he was placed in a cell with a Caucasian prisoner with whom he got along well.  (Compl. ¶¶ 25-26.)

On June 26, 2004, Plaintiff returned to his cell to find that his cassette tapes, tape-player and headphones had be stolen while his cell-mate went to the bathroom.  Plaintiff and his cell-mate had reported the theft of their cell key shortly before the theft.  (Compl. ¶ 27.)  Plaintiff requested that officers conduct "shake-downs" to locate the stolen property, but the requests were denied.  Plaintiff witnessed a number of prisoner's selling his property in the unit.  (Compl. ¶ 28.) In addition, he witnessed Martin discussing the theft with one of the prisoners who had regularly accosted Plaintiff.  Plaintiff complains that, although no prison investigation was conducted to locate the stolen materials, a prison investigator was assigned to determine whether Plaintiff was a "stalker" or had otherwise engaged in inappropriate behavior.  (Compl. ¶¶ 29-30.)

Plaintiff filed a grievance on June 29, 2004, Grievance No. MCF 04-07-00444-28BC (Def. Mot. for Sum. J., Ex. 3, docket #12-5.), alleging that his cell was robbed on June 26, 2004, as the result of Defendant Martin's retaliation for filing the earlier grievances.  The grievance also alleged that MCF Warden, John Cason, MCF Deputy Warden, Terry Bradford, and MCF Assistant Deputy Warden of Housing, Mark Malone, were responsible for their lack of supervision over Martin and their failure to train.  (Def. Mot. for Sum. J. Ex. 3.)  The grievance was rejected by the MCF grievance coordinator, Matt Brevard, because it raised multiple claims.  Plaintiff asserts that Brevard advised him to submit a new grievance that did not contain multiple issues.  Plaintiff therefore immediately filed two new timely grievances, Nos. MCF 04-07-00472-28A and MCF 04-07-00471-28A, placing his retaliation allegations against Martin in Grievance No. MCF 04-07-00472-28A and his negligence/failure to train allegations against Cason, Bradford and Malone in Grievance No. MCF 04-07-00471-28A.  (Def. Mot. for Sum. J. Ex. 4-5, docket ##12-6, 12-7.)

Brevard rejected Grievance No. MCF 04-07-00471-28A as duplicative of MCF 04-07-00444-28BC and rejected Grievance No. MCF 04-07-00472-28A as duplicative of both MCF 04-07-00444-BC and MCF 04-07-00471-28A.  Plaintiff appealed both grievances through Step III. At Step III, the investigator agreed with the decisions at Steps I and II that Grievance No. MCF 04-07-00471-28A was duplicative of MCF 04-07-00444-28BC.  With respect to Grievance No. MCF 04-07-00472-28A, however, the Step III investigator concluded that the grievance was more appropriately rejected for containing multiple issues, and the investigator therefore affirmed the rejection, but changed the last digit of the grievance code to "C" rather than "A" in order to correspond to the reason for the rejection.

In September 2004, after Plaintiff had complained about the theft of his property, he was transferred to Unit One at MCF.  After Plaintiff was moved, Martin began entering Unit One, seeking out black, Muslim prisoners, to whom he repeated his allegations that Plaintiff was a snitch. As a result of the rumors spread by Martin, Plaintiff was assaulted once and his personal typewriter was damaged by a black, Muslim prisoner, who bragged to Plaintiff about the conduct.  In addition, Martin periodically was stationed in the Unit One dining hall.  On those occasions, Martin routinely positioned himself directly behind Plaintiff to announce to black, Muslim prisoners that Plaintiff was a "snitch," a "rat," or a "predator."  (Compl. ¶¶ 31-32.)

In Count I of the complaint, Plaintiff alleges that Defendant Martin took numerous actions in retaliation for Plaintiff's exercise of his rights to free speech and petition under the First Amendment.  In Count II of the complaint, he alleges that Martin conspired with and induced various prisoners to violate MICH. COMP. LAWS § 750.147b, by engaging in racial intimidation. Plaintiff seeks compensatory and punitive damages.

## Discussion

Defendants claim that they are entitled to summary judgment because Plaintiff failed to exhaust his available administrative remedies.  Pursuant to 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies.  *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001).  A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process.  *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999).  In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006).  "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective Dec. 19, 2003)[1] sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint.  Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control  *Id.* at ¶ R.  If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution.  *Id.* at ¶¶ R, X.  The Policy Directive also provides the following directions for completing grievance forms:

---

[1]The MDOC recently amended Policy Directive 03.02.130 on July 9, 2007.  However, the 2003 version of the policy directive was in effect at all times applicable to this lawsuit.

"The issues shall be stated briefly.  Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included."  *Id.* at ¶ T (emphasis in original).  The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent.  *Id.* at ¶ Y.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within five business days of the response, or if no response was received, within five days after the response was due.  *Id.* at ¶¶ R, DD.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances.  *Id.* at ¶ FF.  If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form.  *Id.* at ¶¶ R, HH.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.  *Id.* at ¶ HH.  The Prisoner Affairs Section is the respondent for Step III grievances on behalf of the MDOC director.  *Id.* at ¶ II.  Time limitations shall be adhered to by the inmate and  staff at all steps of the grievance process.  *Id.* at ¶ U.  "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ."  *Id.*

In addition, the grievance policy provides that, where the grievance alleges staff brutality or corruption, the grievance may be submitted directly to Step III.  *Id.* at ¶S.  In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I. *Id.*

-10-

### A.    Grievance Nos. MCF 04-01-00002-03C and MCF 04-01-00007-17A and Unidentified March 8, 2004 Grievance

Defendant contends that Grievance Nos. MCF 04-01-00002-03C and MCF 04-01-00007-17A, which addressed Plaintiff's complaints regarding his December 2003 cell reassignment and Martin's January 5, 2004 conduct, are unexhausted because Plaintiff signed off on both grievances on February 5, 2004.  Defendant further asserts that it has no record of the grievance Plaintiff purports to have filed directly to Step III on March 8, 2004 and Plaintiff supplies no evidence of such grievance.

Plaintiff does not contest that claims arising from the facts set forth in the December 31, 2003 and January 5 grievances are unexhausted.  He also expressly alleges in his complaint that he withdrew his March 8, 2004 grievance.  As a result, no genuine issue of fact exists that claims arising out of the conduct alleged in the three grievances is unexhausted.  Neither count of Plaintiff's complaint, however, is based on the conduct contained in the December 31, 2003 or January 5, 2004 conduct.  Instead, he alleges that the filing of those grievances constituted the motivation for Defendant Martin's subsequent retaliatory conduct.

In contrast, the issues purportedly raised in the March 8, 2004 grievance included allegations of retaliation from February 2004 through the first week of March 2004.  Those issues are included as part of the retaliatory conduct alleged in the complaint.  As a result, to the extent Plaintiff seeks relief for retaliatory conduct occurring prior to March 8, 2004, Defendant is entitled to summary judgment on the basis of exhaustion.

### B.    Grievance No. MCF 04-07-00444-28BC

On June 29, 2004, Plaintiff filed Grievance No. MCF 04-07-00444-28BC, complaining of the theft of his personal property on June 26, 2004, which he alleged had been

encouraged by Defendant Martin in retaliation for Plaintiff's past complaints.  The grievance also alleged that the Warden, Deputy Warden and Assistant Deputy Warden for Housing were responsible for the thefts because of their failure to train and properly supervise Defendant Martin. MCF Grievance Coordinator, Matt Brevard, rejected the grievance because it raised multiple claims. Plaintiff did not appeal the rejection.  Instead, he immediately filed two new grievances, Nos. MCF 04-07-00472-28A and MCF 04-07-00471-28A, placing his retaliation allegations against Martin in Grievance No. MCF 04-07-00472-28A and his negligence/failure to train allegations against Cason, Bradford and Malone in Grievance No. MCF 04-07-00471-28A.

As a consequence, it is undisputed that Plaintiff failed to exhaust Grievance No. MCF 04-07-00444-28BC through Step III of the grievance procedure.

### C.    Grievance No. MCF 04-07-00471-28A

Defendant contends that Plaintiff's revised Grievance No. MCF 04-07-00471-28A against Cason, Bradford and Malone is not "properly exhausted" within the meaning of *Woodford* because it was duplicative of Grievance No. MCF 04-07-00444-28BC, pursuant to MICH. DEP'T OF CORR., Policy Directive 03.02.130(G)(1).  Plaintiff, however, makes no attempt to rely upon the grievance for his claim that he exhausted his administrative remedies against the only Defendant in this case, Anthony Martin.  In fact, Plaintiff specifically alleges that he separated his grievance issues in order to limit the allegations against Martin to Grievance No. MCF 04-07-00472-28A.  As a consequence, exhaustion of Grievance No. MCF 04-07-00471-28A is irrelevant to the action before the Court.  I therefore need not and do not reach the question as to whether Plaintiff has exhausted his issues concerning Cason, Bradford and Malone, who are not parties to this action.

### D.    Grievance No. MCF 04-07-00472-28A

Defendant alleges that Plaintiff's restated grievance against Defendant Martin is not "properly exhausted" within the meaning of *Woodford* because it was duplicative of Grievance No. MCF 04-07-00444-28BC and MCF 04-07-00471-28A, pursuant to MICH. DEP'T OF CORR., Policy Directive 03.02.130(G)(1).

Policy Directive 03.02.130 provides that grievances may be rejected for a variety of defects, including the following:

> If it is vague, illegible, contains multiple unrelated issues, or raises issues that are duplicative of those raised in another grievance filed by the grievant.

MICH. DEP'T OF CORR., Policy Directive 03.02.130(G)(1).  The policy further states that

> A grievant whose grievance is rejected may appeal the rejection to the next step as set forth in this policy.  *A new grievance shall not be filed regarding the rejection.*

MICH. DEP'T OF CORR., Policy Directive 03.02.130(I) (emphasis added).

Based on these portions of the policy, Defendant first asserts that Policy Directive 03.02.130(I) prohibited Plaintiff from filing Grievance No. MCF 04-07-00472-28A because his restated grievance raised some of the same issues raised in the first grievance and was therefore duplicative under Policy Directive 03.02.130(G)(1).  Second, he argues that PD 03.02.130(I) prohibited Plaintiff from refiling the more limited grievance, requiring him instead to appeal the rejection.

In response, Plaintiff raises three arguments as to why Defendant's motion should be denied.  First, he argues that the requirement of "proper exhaustion" established in *Woodford*, 126 S. Ct. 2378, amounts to a change in the law of this circuit, which previously provided that "improper" exhaustion did not procedurally default federal civil rights claims.  *See Thomas v. Woolum*, 337 F.3d 720 (6th Cir. 2003).  Plaintiff asserts that, at the time he filed his grievances, he

lacked the constitutionally necessary notice that an imperfection in his grievance would bar his federal complaint. He therefore contends that *Woodford* should not be applied retroactively to bar his complaint.

Second, he asserts that, as a factual matter, prison officials improperly rejected his restated grievance as duplicative under its own rules. He argues that the MDOC applied its rules excessively harshly, with the specific intent of suppressing its content and abridging his rights under the First Amendment.

Third, he argues that the MDOC's hypertechnical application of its procedural rules extend beyond the scope of its legitimate penological interest in managing how prisoner complaints are made. Instead, he contends, the extraordinary limitations imposed by the MDOC effectively eliminate his ability to exercise his First Amendment rights, in violation of *Pell v. Procunier*, 417 U.S. 817 (1974), and *Turner v. Safley*, 482 U.S. 78 (1987).

1.    Retroactivity

Plaintiff's retroactivity argument requires little attention. When the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97 (1993). The rule announced by the Supreme Court in *Woodford* was made applicable to the parties in that case. *Woodford*, 126 S. Ct. at 2393. As a result, the Court must apply the rule to the parties in the instant case. *See Rollings-Pleasant v. Deuel Vocational Ins.*, No. CIV S-03-0228 MCE EFB P, 2007 WL 2177832 (E.D. Cal. July 27, 2007) (holding that *Woodford* is fully retroactive, notwithstanding the existence of circuit precedent rejecting the notion of "proper exhaustion" at the time the plaintiff attempted to exhaust his remedies).

2.      Abusive application of PD 03.01.130

In *Woodford*, the Supreme Court left unresolved many issues concerning the application of the requirement of "proper" exhaustion.  For example, the Court did not address how the courts should handle circumstances in which a prison has rejected a prisoner grievance on procedural grounds that are unsupported by the factual record.  Similarly, the Court did not reach a determination about whether the prison must have relied upon the procedural bar and, if so, at what level of administrative review.  Further, the Court noted but did not consider "the possibility that prisons might create procedural requirements for the purpose of tripping up all but the most skillful prisoners . . . ," and situations in which a prisoner is prevented from complying by circumstances beyond his own control.  *See Woodford*, 126 S. Ct. at 2393 (Breyer, J., concurring) (citing *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004) ("We note that the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not "available" to the plaintiff, and (c) circumstances in which administrative remedies are "available," but the prisoner's original failure to exhaust is nonetheless justified, and hence does not bar the prisoner's subsequent suit.")).

In reaching its decision, however, the *Woodford* Court relied in substantial measure on both the law of administrative exhaustion as applied to other civil contexts and the law of habeas corpus procedural default.  Applying law from other civil administrative contexts, some courts have recognized that exceptions to the "proper exhaustion" requirement are necessary for "special circumstances" that may justify a failure to comply with administrative procedural requirements. *See Giano*, 380 F.3d at 677; *Spruill v. Gillis*, 372 F.3d 218, 234 (3d cir. 2004) (holding that a prison grievance system determines the scope of procedural requirements, but such requirements must be consistent with the federal constitution and federal policy).  Other courts addressing "proper

exhaustion" have noted that exceptions to the doctrine must be provided for circumstances in which defendants have interfered with the prisoner's ability to exhaust. *See Zamboroski v. Karr*, No. 04-73194, 2007 WL 541921, at *5 (E.D. Mich. Feb. 16, 1997) (where defendants' conduct renders grievance process a nullity, grievance deemed exhausted); *Flory v. Claussen*, No. C06-1046-RSL-JPD, 2006 WL 3404779, at *4 (W.D. Wash. Nov. 21, 2006) (prisoner's efforts to exhaust with wrong entity deemed to be proper exhaustion where prison policy was unclear and prisoner relied on defendants' advice). Other courts have rejected a prison's decision that a prisoner grievance violated a procedural rule where the court's review of the grievance and the policy indicates to the contrary. *See Woods v. Lozer*, No. 3:05-1080, 2007 WL 173704, at *3 (M.D. Tenn. Jan. 18, 2007) (finding that the prison's rejection of a grievance on the grounds that the claim should have been raised in the disciplinary process was inconsistent with a proper reading of prison procedure); *Hardin v. Fullenkamp*, No. 4-99-CV-80723, 2001 WL 35816398, at *10-11 (S.D. Iowa June 22, 2001). Moreover, several courts have recognized the concern alluded to but not decided in *Woodford*: where excessively technical procedural requirements frustrate the proper exercise of that procedure by all but the most sophisticated inmates, is the grievance procedure "available" within the meaning of the PRLA. *See Kikimura v. Osagie*, 461 F.3d 1269, 1283-84 (10th Cir. 2006) (recognizing that "[t]he Supreme Court has cautioned that 'the creation of an additional procedural technicality . . . [is] particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.'") (quoting *Love v. Pullman Co.*, 404 U.S. 522, 526-27 (1972)).

In addition, the *Woodford* Court recognized that "the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default 'are similar in purpose and implicate similar concerns . . . .'" *Woodford*, 126 S. Ct. at 2387 (quoting *Keeney v. Tamayo-Reyes*,

504 U.S. 1, 7 (1992)).  The doctrine of habeas procedural default is of assistance in analyzing how the federal courts should evaluate and understand the doctrine of "proper exhaustion" under the PRLA.  In the habeas context, to determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  Moreover, the procedural default doctrine permits a petitioner who procedurally defaulted his federal claim in state court, to overcome his default by demonstrating either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.

　　　　As applied to the context of proper exhaustion of prison administrative remedies, the contours of the procedural default doctrine would require the Court to consider whether the last administrative decisionmaker relied on an established procedural rule and whether a reasonable reviewer could have determined that the prisoner actually violated the established rule.  In the instant case, it is not clear as a matter of law that Plaintiff's new grievance is truly duplicative of his earlier grievance within the meaning of the MDOC policy.  Instead of duplicating the allegations of the original grievance, Plaintiff's revised grievance contains more limited allegations, which are

directed solely at the actions of Defendant Martin.  Moreover, Plaintiff alleges and he stated in the text of his new grievance that he had been instructed to file the new grievances by the MCF grievance coordinator.  Because the policy does not clearly prohibit all grievances that raise any portion of an earlier grievance rejected for having multiple issues, a genuine issue of fact exists as to whether Grievance No. MCF 04-07-00472-28A was duplicative of Grievance No. MCF 04-07-00472-28A within the meaning of the PD 03.02.130(G)(1).  Further, where, as here, Plaintiff alleges that "instructions by prison officials that are at odds with the wording of [state regulations]" the formal grievance procedure arguably is "unavailable . . . within the meaning of 42 U.S.C. § 1997e." *Brown v. Croak*, 312 F.3d 109, 112 (3d Cir. 2002).  For all these reasons, the determination whether Grievance No. MCF 04-07-00472-28A was duplicative remains one of fact.

Defendant next argues that PD 03.02.130(I) prohibited Plaintiff from refiling a more limited grievance.  He argues that the provision expressly limits Plaintiff's options to appealing the dismissal of his first grievance.  The cited language, however, does not support Defendant's position.  Instead, PD 03.02.130(I) prohibits a grievant from filing a new grievance "regarding the rejection."  Plaintiff did not file a grievance regarding the rejection; he did not challenge the rejection in his new grievance.  Instead, he filed a grievance including a smaller number of the issues than those raised in MCF 04-07-00444-28BC, which had been rejected for containing multiple unrelated issues.  Had Petitioner wished to challenge the Step I finding that his original grievance raised multiple issues, he would have been required to appeal the rejection through Step III.  Here, however, Plaintiff accepted the conclusion that his original grievance included multiple issues.  The policy does not clearly prohibit Plaintiff from filing a corrected grievance.

Nevertheless, notwithstanding my conclusions concerning the finding at Steps I and II that the grievance was duplicative, the Step III investigator did not find that the grievance was duplicative.  Instead, the Step III investigator changed the grievance code in order to more

accurately capture the reason the grievance was rejected – because it complained about multiple issues.  The investigator specifically stated that the grievance alleged "theft of property, staff malfeasance, denial of room change request, and other vague and unrelated complaints."

As I previously discussed, application of the habeas procedural default doctrine to the PRLA context would require this Court to look to the last  "reasoned judgment rejecting the [federal] claim."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  The procedural default doctrine is applicable if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming Petitioner's conviction."  *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).  Here, the Step III grievance investigator relied on the fact that the grievance "contained multiple unrelated issues."  MICH. DEP'T OF CORR., Policy Directive 03.02.130(G)(1).

Plaintiff's revised grievance, like his complaint in the instant case, is not a model of clarity.  The grievance initially complains about the theft of his property on June 26, 2004.  It complains that the theft resulted from Defendant Martin's retaliatory actions in threatening and repeatedly accusing Plaintiff of being a "snitch" and a "sexual predator" in the presence of other prisoners.  Although the remainder of Plaintiff's lengthy grievance appears in part to describe the extensive history leading up to the theft, Plaintiff repeatedly complains of prior retaliatory conduct for which Plaintiff appears to seek individualized remedies.  For example, Plaintiff complains that he was improperly transferred for making complaints about smoking; he complains that Martin refused to let him retrieve his laundry bag; he complains that Martin would not sign his library pass; he describes Martin's repeated refusals to enforce the nonsmoking policy; and he complains that prisoners baited by Martin attempted to assault him on an earlier occasion.  Although some of the complaints listed in the grievance arguably are "related" to the extent that they allege the same

retaliatory motive, they are not "related" to the extent they seek relief for multiple incidents of alleged misconduct occurring over a period of six months.  The Step III investigator's determination that the grievance raised multiple unrelated issues therefore appears reasonably supported under the established prison procedure.

As a consequence, because Plaintiff's Grievance No. MCF 04-07-00472-28A was reasonably rejected by the Step III investigator for raising multiple unrelated issues, the grievance was not "properly exhausted" within the meaning of *Woodford*.

3. *Pell/Turner* violation

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822.  Nevertheless, a prisoner's constitutional rights are subject to severe restriction. *See*, *e.g*, *Bell v. Wolfish*, 441 U.S. 520 (1979) (restriction on receipt of reading materials); *Hudson v. Palmer*, 468 U.S. 517 (1984) (privacy); *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974) (right to call witnesses); *Richardson v. Ramirez*, 418 U.S. 24 (1974) (vote).  *See*, *generally*, *Washington v. Harper*, 494 U.S. 210 (1990); *Turner v. Safley*, 482 U.S. 78 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).  Challenges to prison restrictions that inhibit First Amendment interests therefore "must be analyzed in terms of the legitimate policies and goals of the corrections system . . . ." *Pell*, 417 U.S. at 822.

In *Turner v. Safley*, 482 U.S. at 88-95, the Supreme Court held that, when a prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.  *Id.*; *Washington*, 494 U.S. at 223-25.  The *Turner* Court expressly rejected any degree of "heightened [judicial] scrutiny" of prison regulations, in order to ensure that "prison administrators . . ., and not the courts, . . . make the difficult judgments

concerning institutional operations." *Id.* at 89 (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977)). The *Turner* Court set forth four factors "relevant in determining the reasonableness of the regulation at issue." 482 U.S. at 89-91. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Id.* at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). Second, the reasonableness of a restriction takes into account whether there are "alternative means of exercising the right that remain open to the prison inmate." *Turner*, 482 U.S. at 90. Third, a court should consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Finally, the existence or absence of "ready alternatives for accommodating the prisoner's rights is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. This final factor, however, "is not a 'least restrictive alternative' test." *Id.* at 90. "Prison officials need not show that no reasonable method exists by which [prisoners'] . . . rights can be accommodated without creating bona fide [prison] problems." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987) (internal quotations omitted).

Defendant argues that PD 03.02.130, in establishing the necessary requirements for prisoner to properly exhaust administrative remedies, serves a valid penological purpose. He asserts that imposing restrictions on the filing of grievances allows officials an opportunity to resolve disputes before being haled into court. He further alleges that observance of the system's critical procedural rules is necessary to provide the prison with a fair opportunity to consider the grievance. Finally, he contends that compliance with MDOC procedural rules helps to both reduce the quantity and improve the quality of prisoner lawsuits.

Defendant's legitimate penological justifications for the MDOC's grievance policy

are taken directly from those identified by the Supreme Court in *Woodford*, 126 S. Ct. at 2387-88, which this Court does not dispute.  The justifications, however, are valid only insofar as the procedures identified are actually and reasonably linked to those purposes.  *See Turner*, 482 U.S.at 89.  Plaintiff's argument is not that the MDOC has no interest in adopting a set of procedural requirements for the grievance process.  Instead, he argues that the MDOC is creating and stringently applying excessively complicated rules and narrow time constraints, not for the purpose of improving the quality of the administrative record and affording a fair opportunity for the prison to address the complaint, but for the purpose of depriving prisoners of access to the administrative process and, therefore, to the federal courts.  Such a governmental objective would be neither "legitimate [nor] neutral . . . ."  *Turner*, 482 U.S. at 90.

Were the Court to accept without scrutiny a prison's invocation of any manner of complicated procedural rules and excessively stringent application of those rules, Plaintiff's claim arguably would have force.  Rubber-stamping unlimited administrative restrictions would permit state prisons to adopt grievance procedures solely for the purpose of requiring impossible compliance in order to terminate prisoners' access to the courts, in violation of the first prong of the *Turner* test.  *Id.* at 90 (requiring the governmental objective to be both legitimate and neutral).  Such uncritical acceptance of prison restrictions also would permit prisons to effectively eliminate all means for prisoners to exercise their rights to challenge prison conditions, in violation of the second prong of *Turner*.  *Id.* (requiring that prison limitations on constitutional rights leave "alternative means of exercising the right [] open to prison inmates").

This Court, however, need not and does not reach the question of whether Michigan's procedural rules *could* be applied to violate *Turner*.  As previously discussed, the MDOC must apply PD 03.01.130 consistently with existing federal precedent limiting procedural requirements for

exhaustion in the civil administrative context, *see Love*, 404 U.S. at 526-27 (barring creation of excessive procedural technicalities in statutory schemes in which laymen initiate the process), and within the analytical construct of habeas procedural default, *see Hicks*, 377 F.3d at 551 (requiring actual and appropriate state reliance on an independent rule and permitting excuse of a default for cause and prejudice).  With these appropriate limitations, I have concluded that the grievance process was "available" to Plaintiff within the meaning of the PRLA.

For the same reasons, PD 03.01.130, as applied to Plaintiff's Grievance No. MCF 04-07-00472-28A, did not violate the four prongs of the Supreme Court's test in *Turner*, 482 U.S. at 89-91. First, the requirement that Plaintiff not list in a single grievance all incidents occurring over six months is both legitimate and neutral and is rationally connected to the institution's interest in both the accuracy and timeliness of the grievance procedure.  *Turner*, 482 U.S. at 89-90.  Second, the restriction allowed substantial opportunity for Plaintiff to grieve his treatment by filing separate grievances during the course of the alleged retaliation rather than lumping all conduct in a single grievance.  *Turner*, 482 U.S. at 90.  Third, the limitation preserves prison investigative resources by simplifying the claims addressed in any given grievance proceeding.  *Turner*, 482 U.S. at 90. Finally, Plaintiff has failed to identify any ready alternative for the prison to meet its goal of maintaining an efficient and expeditious grievance procedure.

In sum, I conclude that the prison grievance process, as applied to Plaintiff's Grievance No. MCF 04-07-00472-28A, was reasonably related to a legitimate governmental interest. Accordingly, the process did not violate *Turner*, 482 U.S. at 90.

V                    **Recommended Disposition**

For the foregoing reasons, I recommend that Defendants' motion for summary judgment (docket #11) be granted.

Date:  February 8, 2008                          /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).